(No. 20237.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD STERLING, Plaintiff in Error.

*Opinion filed October 25, 1930.*

HAROLD L. LEVY, (ELWYN E. LONG, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

This writ of error is prosecuted to review a judgment of the criminal court of Cook county convicting Edward Sterling of burglary. Several errors are assigned, but the only one argued is the admission of incompetent evidence over the defendant's objection.

The burglary was committed early in the morning of August 1, 1929, in the apartment of Maurice Krum, on the second floor of 4319 North St. Louis avenue, in Chicago, which was occupied by Krum, his wife and baby fourteen months old, who were asleep in one bed-room, while a daughter eight and a half years old and a maid slept in another. The baby's crib was next to a closet in the first bed-room. About 3:30 in the morning Mrs. Krum waked up to cover the children and went back to bed. In a few minutes she heard a peculiar noise and looking around saw the baby had awakened. Then she heard the closet door squeak and the tar bag that was in it rattle. She aroused her husband, telling him there was someone in the closet. He spoke loud, wanting to be heard, and said he could not see anything without his glasses. He went to the dresser, got his glasses and put them on, and as he did so the defendant jumped out at him with his hand in his pocket and said, "Stick them up!" The defendant demanded his money, saying, "Hurry up. Where are your trousers?" Krum said, "Right in here," meaning the living room. They went in there, and as they did so Krum switched on the light—five big flood-lights. The three of them, Krum, Mrs. Krum and the defendant, were in the room. The defendant was not masked and the other two had a good look at him. He said to Krum, "Don't put your hand in there; give me the trousers." Krum tossed them to him and he caught them and backed out and started down the stairs. Krum called out "Help!" and "Hold-up!" and the neigh-

bors came in. Then he called the police. He had in the pockets of the trousers a purse, a watch worth $10, a pair of cuff links worth $15, and $7 or $8 in cash. Mrs. Krum's purse had been emptied and a fountain pen and pencil worth $10, a pair of cuff links, $6 in cash, and her wrist watch, worth $70 or $75, were taken. Both Mr. and Mrs. Krum testified to these circumstances and identified the defendant at the trial positively. About six weeks later, on September 16, the defendant was arrested. His picture was published in the *Chicago American* and was seen by Mr. and Mrs. Krum, each of whom separately recognized it immediately as the picture of the burglar in their apartment. Krum called up the police department, and later, at the request of the police, went to the detective bureau to a show-up of prisoners and there identified the defendant.

The defendant testified denying his presence in the apartment and any connection with or knowledge of the things testified by the Krums to have happened there. He further offered the defense of an alibi, supported by the testimony of his mother and Harold H. Jacobs as well as his own. Rebecca Sterling, his mother, was a tailoress working on women's garments, who had been working at that trade for the last twenty-five years. She lived with the defendant, who was nineteen years old, at 1332 North Shore avenue, in an apartment consisting of a living room and two bed-rooms. On the night of July 31 her sister, her sister's husband and their son from Boston were visiting her. She testified that about 7:00 or 8:00 o'clock her son, her brother-in-law and her nephew went out in the car and returned about 10:30 or 11:00 o'clock, bringing a lot of dishes, packages and boxes, about six or eight baskets containing a lot of dishes, and some other things. The defendant was helping with the things. They stayed quite a while, and then they all, including the defendant, had a light lunch, and Jacobs said he had to go to work. The rest remained up until 1:00 or 2:00 o'clock and then went to sleep. The

defendant and his cousin slept in one bed in the living room and Mrs. Sterling slept on a day-bed in the same room. The next morning she arose, dressed for work and left the defendant asleep with her nephew. Jacobs testified that he was a chauffeur for the Parmalee Company, and on the night of July 31 the defendant came to his home about 9:00 o'clock in the evening with his cousin in the latter's Willys-Knight automobile, and they moved some dishes belonging to Jacobs to the house of the defendant's mother in the automobile. The dishes were packed in boxes and barrels. They got to Mrs. Sterling's about 10:30. Jacobs helped to carry the dishes up-stairs and to unpack them. It took them about fifteen minutes and Jacobs then said he had to leave, about 11:00 o'clock. When Jacobs left, the defendant was in his own home, reading. The defendant's testimony agrees with Jacobs'. The defendant testified that after Jacobs left he read and talked a while and then went to bed about 12:30, sleeping with his cousin while his mother slept in the day-bed in the same room. He got up about 10:00 or 10:30.

The alibi evidence, except that of the defendant, covers only the time prior to 1:00 o'clock, while the robbery occurred at 3:30 in the morning. His mother's testimony left him asleep at 1:00 and found him asleep in the morning when she left for work, but the intervening time is in no manner covered. The distance between the two apartments is not shown, and the evidence does not disclose any reason why the burglar, who so quietly entered the apartment of the Krums without waking the inmates, might not have left Mrs. Sterling's apartment in the same manner. The alibi therefore rested wholly on the testimony of the defendant, for all the other testimony may be accepted as true and still the defendant is proved guilty unless his own testimony is believed. His identity as the burglar was clearly proved unless his own testimony was sufficient to raise a doubt as to his guilt, and it is therefore a vitally important

question whether any evidence was improperly admitted affecting his credibility.

One instance of alleged improper admission of evidence is in the cross-examination of Mrs. Krum, who, in answer to the question, "Did you call for help?" answered: "Mr. Krum hollered for help and some of our neighbors came out. The down-stairs neighbor came out, and he said, 'I have been robbed, too.' And he found his door and window open also. His trousers were missing. He didn't have anything to put on." The defendant moved that the answer be stricken, but the motion was denied. The answer was not responsive to the question, was hearsay and tended to show another crime for which the defendant was not on trial, but it was not prejudicial to the defendant. The sole question in this case was the identity of the defendant, and by no stretch of the imagination can it be supposed that the fact that another burglary was said to have been committed in the same building at the same time could affect the credibility of the defendant on trial.

Another instance of alleged improper admission of evidence arose in the re-direct examination of Mrs. Krum in regard to what occurred at the police station when she and her husband identified the defendant. She testified on this re-examination that the defendant's name was not mentioned at the show-up, but the minute they brought him out she said to her husband that he had better tell them that was the fellow, and he went up to officer Miller and told him that they recognized him before Miller had asked his name. She was present when her husband said that—right behind him—and heard him. She knew that they went down to identify the defendant. Her husband was there, and it was probable that he knew him as well as she did. It is insisted that this re-direct examination continually brought out evidence which was incompetent and highly prejudicial. The only part of this testimony to which an objection was made was the statement, "My husband was there, and it

was probable that he knew him as well as I did." The conversation between the husband and wife or between both or either of them and the officer at the show-up in regard to the identification of the defendant was incompetent. It was a transaction wholly between strangers. There is no evidence that the defendant heard any part of it, and it had no tendency to prove against him their identification of him. However, it was not prejudicial to him. Krum testified that he recognized the defendant the minute he came out at the show-up, and Mrs. Krum testified that they brought in nine men, and in the last row—the sixth row and the last man—she saw the defendant and recognized him. There was no contradiction of this testimony or of the fact that Mr. and Mrs. Krum identified the defendant at the show-up. In fact, the defendant himself testified that Mr. and Mrs. Krum said to him, "You are the fellow that broke into our house," and he said, "I beg your pardon, madam, you are mistaken." She said, "Don't you remember me?" and the defendant said that he never saw her before. Her remark that it was probable that her husband knew him as well as she did was immaterial. It was shown that he did know the defendant as well as she did and her statement did not prejudice the defendant. Had there been any substantial contradiction in the evidence as to Mr. and Mrs. Krum's identification of the defendant at that time, as in the case of *People* v. *Krejewski,* 332 Ill. 120, the admission of their conversation between themselves or with the officer, to corroborate their testimony, would have been improper, but in the condition of this record it was harmless.

The testimony of the officer Harry Miller was another instance of the alleged improper admission of evidence of the identification of the defendant by Mr. and Mrs. Krum at the show-up by hearsay evidence that they had done so. The evidence was incompetent but harmless, because all that it tended to prove was otherwise proved without contradiction by competent evidence. The case of *People* v. *Lukos-*

*zus,* 242 Ill. 101, on which the defendant relies as authority for holding this testimony incompetent, does not justify his conclusion. In that case the defendant's connection with the crime rested on the testimony of a single witness. The officer who arrested the defendant was asked if anyone gave .him a description of the defendant, and answered, over objection, that he got the description from this witness, and that this witness was the man to whom the defendant was taken for identification. This evidence was held to be hearsay—the same thing as permitting one witness to testify that the other told him the defendant was the man—and amounted to a corroboration of the other witness' testimony identifying the defendant by his statement made on another occasion. This case presents no such situation. The two witnesses, whether rightly or mistakenly, identified the defendant. There was no doubt about their identification of him as the burglar when he was brought out. In answer to the request to tell what happened, the officer testified that they said that was the man, there on the end. That man was the defendant. This was hearsay and incompetent, but the fact is that the witnesses did identify the defendant. The testimony .was not of a statement made at another time to corroborate the statement made on the witness stand. There was no contradiction of the identification of the defendant by the two witnesses, whatever may have been the value of the identification in the judgment of the jury in considering the verdict. The proof of the fact of the identification, whether correct or incorrect, was shown by competent and uncontradicted evidence, and the incompetent evidence of the police officer was therefore harmless.

While the court will not permit a conviction procured by the admission of incompetent evidence to stand, a judgment will not be reversed for the admission of incompetent evidence which the court can see was not prejudicial to the defendant.

The judgment is affirmed. *Judgment affirmed.*